RECEIVED

JAN 0 4 2006

CLERK U.S. DISTRICT COURT
ANCHORAGE, ALASKA

Christopher D. Cyphers
FRONTIER LAW GROUP, LLC
800 E. Dimond Blvd., Suite 3-400
Anchorage, AK 99515

Attorneys for Defendants, Owners
of MV *WILD SALMON*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| BAY BANK, a division of Cowlitz Bancorp, a Washington State-chartered bank, <br><br>        Plaintiff, <br><br>     v. <br><br> WILD SALMON, Official No. 1077274, its Engines, Machinery, Appurtenances, etc., *In Rem*, <br><br>        Defendant, <br><br>     v. <br><br> THE 13TH REGIONAL CORPORATION, an Alaska Corporation, <br><br>        Third Party Defendant. | IN ADMIRALTY <br><br> **CASE NO. A05-265 CV** |

_Sidebar (left margin):_ Frontier Law Group, LLC
800 E. Dimond Blvd., Suite 3-400
Anchorage, AK 99503
Telephone 907-561-3400; Facsimile 907-561-3401

## ANSWER, DEFENSES, COUNTERCLAIMS AND THIRD PARTY CLAIMS

Wild Alaskan Seafood House, LLC, and R. Bruce Johnston and Ray

Wadsworth, as their interests may appear by Christopher Cyphers, now respond to the

complaint herein.

## ANSWER

This Answer, Defenses, Counterclaims and Third Party Claims of Defendant contain eight numbered paragraphs, each corresponding to the like numbered paragraph in the Complaint. A denial for lack of information sufficient to form a belief as to the truth or falsity of an allegation is indicated as a "Qualified Denial." A denial of an allegation that improperly pleads a legal conclusion or contention, or that otherwise does not require a response (e.g., because it simply pleads an argumentative contention as to what a document says) is indicated as a "Contention Denial." The Affirmative and Additional Defenses of Defendant begin with paragraph 9; the Counterclaim of the Defendant begins at paragraph 22; and the Third Party Claims of Defendant begin at paragraph 64.

1.    Contention Denial.

2.    Admit.

3.    Admit.

4.    Admit.

5.    Admit first sentence. Admit Second sentence, except deny Mortgage is valid.

6.    Qualified Denial.

7.    Deny.

8.    Contention Denial.

## ADDITIONAL AND AFFIRMATIVE DEFENSES

9.    Plaintiff's Complaint fails to state a claim upon which relief may be

Frontier Law Group, LLC
800 E. Dimond Blvd., Suite 3-400
Anchorage, AK 99503
Telephone 907-561-3400; Facsimile 907-561-3401

granted.

10.     Plaintiff's claims against the answering defendants are barred, in whole or in part, by the equitable doctrines of waiver, estoppel, and/or laches.

11.     Plaintiff failed to act in good faith in connection with the performance and/or enforcement of obligations governed by the Uniform Commercial Code and/or other contracts. All matters set forth as Counterclaims below are here incorporated in this defense.

12.     As a consequence of Plaintiff's lack of good faith and because of the matters set forth as counterclaims below, Defendant, to the extent it is asserted to be a guarantor, is entitled to assert the defenses of exoneration, subrogation, and the rule of *Paine vs. Packard.*

13.     As a consequence of Plaintiff's lack of good faith and because of the matters set forth as counterclaims below, Defendant, to the extent that it is asserted to be a guarantor, has been released as guarantor by virtue of Plaintiff's conduct and lack of clean hands.

14.     Plaintiff has failed and refused to take any reasonable steps to mitigate its losses or damages.

15.     The 13th Regional Corporation, an Alaska Corporation ("The 13th"), is a joint obligor upon the loan that Plaintiff claims encumbers the *Wild Salmon.* Plaintiff's failure to pursue The 13th constituted a failure of the Plaintiff to observe reasonable

**Frontier Law Group, LLC**
800 E. Dimond Blvd, Suite 3-400
Anchorage, AK 99503
Telephone 907-561-3400; Facsimile 907-561-3401

commercial standards of fair dealing.

16.     Because neither the *Wild Salmon* nor her owner, Wild Alaskan Seafood House, LLC, is an obligor upon the note evidencing the debt alleged to encumber the *Wild Salmon*, the obligors upon said note, AlaskaCatch, LLC and/or The 13th Regional Corporation, are necessary parties to this action, despite its alleged *In Rem* character, and Plaintiff has failed to join such necessary party or parties.

17.     The arrest of the *Wild Salmon* violated due process under the Alaska and U. S. Constitutions in that it was accomplished without notice to the known vessel owner, no emergent circumstances were alleged or existed, and the arrest was accomplished with the intent and effect of depriving the vessel owner of property without due process of law.  Such arrest should be quashed.

18.     The Marshal's sale process, in the circumstances of this case, will result in the deprivation of property without due process or law and/or the unnecessary, inequitable and unconscionable loss of property or the value thereof.  Equity demands that an alternate and equitable sale process be employed if a sale is ordered and the court should set an upset price for the vessel in connection with a sale thereof.

19.     Plaintiff knew that equipment on the vessel belonged to parties not obligated in any way to Plaintiff and that the alleged Mortgage did not create a lien on such equipment.  Plaintiff had such knowledge because the equipment was sold by order of the U. S. Bankruptcy Court for the Western District of Washington at Seattle, the Honorable

Frontier Law Group, LLC
800 E. Dimond Blvd., Suite 3-400
Anchorage, AK 99503
Telephone 907-561-3400; Facsimile 907-561-3401

Karen Overstreet presiding, under 11 U.S.C. § 363, *free and clear of all liens and claims*. A representative of (and counsel for) Plaintiff was present at the hearing sale was approved by the Bankruptcy Court. The assertion by Plaintiff that all equipment on the *Wild Salmon* was subject to its Mortgage was therefore a willful misrepresentation to this Court, constituted an improper distraint if not a conversion of personal property, and is further grounds for the quashing of the Arrest by which this action was initiated.

20.    After application of all damages and/or set-offs due from Plaintiff/Counterclaim Defendant, no amounts are due from any source that would constitute an encumbrance against the *Wild Salmon*.

21.    All matters herein below asserted as counterclaims are also asserted as defenses.

### COUNTERCLAIMS

### PARTIES

22.    The *Wild Salmon* is a Documented United States Vessel, O.N. 1077274, located in Alaska.

23.    Plaintiff/Counterclaim Defendant Bay Bank is a Washington State Chartered Bank and a member of FDIC. It is subject to the laws and regulations governing Washington chartered banks and FDIC insured institutions, including the obligations to have written operating procedures governing its operations consistent with such laws and regulations.

**Frontier Law Group, LLC**
800 E. Dimond Blvd., Suite 3-400
Anchorage, AK 99503
Telephone 907-561-3400; Facsimile 907-561-3401

24.    Plaintiff/Counterclaim Defendant Bay Bank is a successor in interest by merger to Asia Europe Americas Bank, aka AEA Bank (hereinafter "AEA Bank").

25.    Prior to its merger into Bay Bank, AEA Bank was a Washington state chartered bank and a member of FDIC, subject to the laws and regulations governing Washington state chartered banks and FDIC insured institutions including the obligations to have written operating procedures governing its operations consistent with such laws and regulations.

## FIRST CLAIM – BREACH OF CONTRACT

26.    Claimants reallege the material set forth above in these Counterclaims.

27.    For several months prior to February 20, 2003, AlaskaCatch, LLC, a Washington limited liability company ("AlaskaCatch"), negotiated with AEA Bank for issuance of a loan to be guaranteed by the United States Department of Agriculture under its Business And Industry Loan Guaranty Program ("USDA Program") and for other services to be provided separately by AEA Bank.

28.    Initially, the loan request by AlaskaCatch was for $5 million. However, AEA Bank advised AlaskaCatch that its "House Limit" was $2.5 million, and that its government mandated loan limit was substantially less than $5 million to any single borrower.

29.    AlaskaCatch advised AEA Bank that it required a capital loan of approximately $2.5 million and a working capital loan of approximately $2.5 million.

**Frontier Law Group, LLC**
800 E. Dimond Blvd., Suite 3-400
Anchorage, AK 99503
Telephone 907-561-3400; Facsimile 907-561-3401

Without both credit facilities, its operation could not be successful.

30.    Rather than turn down the application of AlaskaCatch, AEA Bank, through its officers Messrs. Blackburn and Kuel, recommended to AlaskaCatch that AEA Bank issue a $2.5 million USDA guaranteed capital loan to be secured by the capital assets of AlaskaCatch.  AEA Bank would provide, as a service, expert assistance to AlaskaCatch to obtain an additional working capital loan of $2.5 million from another source to be secured separately by the inventory and receivables of AlaskaCatch.

31.    AEA Bank advised AlaskaCatch that they had special expertise, experience and contacts that it would provide for a customary fee to AlaskaCatch to obtain from another institution the required working capital loan of approximately $2.5 million. AEA Bank told AlaskaCatch that after the $2.5 million USDA guaranteed capital loan was in place, it would be easy to get the working capital loan in the form on a one-year line of credit, but year-to-year revolving, with the assistance of AEA Bank.

32.    AlaskaCatch proceeded with the $2.5 million USDA Program capital loan based on the promises, advice and commitments of AEA Bank regarding the working capital loan, including the Agreement of AEA Bank to provide all reasonable and necessary assistance to AlaskaCatch.

33.    The *Wild Salmon* and Claimants were and are third party beneficiaries of the AEA Bank/AlaskaCatch agreement regarding the working capital loan.

34.    AEA Bank knew the USDA Program required the initiating bank

Frontier Law Group, LLC
800 E. Dimond Blvd., Suite 3-400
Anchorage, AK 99503
Telephone 907-561-3400; Facsimile 907-561-3401

(AEA Bank) to investigate and certify that the Borrower (AlaskaCatch) would have, post closing, sufficient working capital for the contemplated operations. AEA Bank knew at the time of such certification that the only possible justification was if AEA Bank fully complied with its agreement with AlaskaCatch to assist in obtaining the required working capital loan.

35.    The AEA Bank USDA Program loan to AlaskaCatch closed on or about February 20, 2003 ("AEA USDA Loan"). The principal amount of that loan was $2,369,885.00 — the available loan amount having been reduced from $2.5 million due to various aggregation rules governing the AEA Bank loan limits.

36.    AEA Bank's agreement with AlaskaCatch to assist it in obtaining the working capital loan was not a Credit Agreement as defined in RCW 19.36.100.

37.    Following the closing of the AEA USDA Loan, AEA Bank breached its agreement with AlaskaCatch to assist it in obtaining the working capital loan, and provided virtually no assistance toward obtaining a working capital loan whatever. AEA Bank refused to assist as agreed when asked to do so.

38.    Absent the agreed and promised assistance for the working capital loan, AlaskaCatch was not able to obtain the working capital loan before operations in the summer of 2003.

39.    Consequently, the *Wild Salmon* could not be meaningfully used by AlaskaCatch in 2003.

**Frontier Law Group, LLC**
800 E. Dimond Blvd., Suite 3-400
Anchorage, AK 99503
Telephone 907-561-3400; Facsimile 907-561-3401

**Frontier Law Group, LLC**
800 E. Dimond Blvd., Suite 3-400
Anchorage, AK 99503
Telephone 907-561-3400; Facsimile 907-561-3401

40.    AlaskaCatch and the *Wild Salmon* took all reasonable steps to mitigate damages sustained because of AEA Bank's breach of the AEA Bank/AlaskaCatch working capital agreement.

41.    AEA Bank failed to take any reasonable steps to mitigate damages caused because of AEA Bank's breach of the AEA Bank/AlaskaCatch working capital agreement. AEA obstructed, opposed and interfered with actions of AlaskaCatch and the *Wild Salmon* to mitigate damages.

42.    AlaskaCatch and the *Wild Salmon* sustained large losses as a proximate result of the breach by AEA Bank of its agreements regarding the working capital loan, in an amount to be proven at trial. The losses of AlaskaCatch, however, exceeded the amount of any payments due upon the AEA USDA Loan from its inception to the date of this Counterclaim, and such amounts should be set off against the claims of AEA Bank (and/or Bay Bank) leaving the *Wild Salmon* free of any current claims of Plaintiff/Counterclaim Defendant.

## SECOND CLAIM – GUARANTY, IF ANY RELEASED

43.    Claimants reallege the material set forth above in these Counterclaims.

44.    At the closing of the AEA USDA Loan, Kim Marine Documentation advised the parties that title to the *Wild Salmon* was in the name of Wild Alaskan Seafood House, LLC, and not AlaskaCatch. Therefore, AlaskaCatch could not grant a mortgage on the vessel. Two alternative solutions were presented: (1) transfer the *Wild Salmon* title to

AlaskaCatch and wait for the title transfer to record a mortgage, or (2) have Wild Alaskan Seafood House, LLC, provide a Mortgage in the nature of a common law guarantee. AEA Bank elected the second course, and the Mortgage at issue was executed and delivered. Other than the limited language of the Mortgage, there is no written guarantee agreement between Wild Alaskan Seafood House, LLC, and AEA Bank.

45.    Due to the actions of AEA Bank as hereinbefore and hereinafter set out, AEA Bank has caused the release of any guarantee of the vessel *Wild Salmon*, the Claimants, and/or Wild Alaskan Seafood House, LLC, and the Mortgage has for some time been unenforceable and constituted a slander of title to the vessel *Wild Salmon*.

## THIRD CLAIM – MORTGAGE OBTIANED BY FRAUD AND/OR MATERIAL MISREPRESENTATION

46.    Claimants reallege the material set forth above in these Counterclaims.

47.    AEA Bank repaid itself approximately $900,000.00 from the proceeds of the AEA USDA Loan, in respect of classified loans to other borrowers.

48.    It was AEA Bank's primary purpose in making the AEA USDA Loan to remove those earlier classified loans from the AEA Bank classified loans. AEA Bank attempted to mislead authorized government regulators and to cover up regulatory deficiencies by obtaining the AEA USDA Loan contrary to existing regulatory directives.

49.    As a result of a November 2001 examination of AEA Bank by the FDIC and the Washington Department of Financial Institutions, Division of Banks ("DFI")

**Frontier Law Group, LLC**
800 E. Dimond Blvd., Suite 3-400
Anchorage, AK 99503
Telephone 907-561-3400; Facsimile 907-561-3401

AEA Bank became subject to a Supervisory Directive of DFI (the "Directive") dated February 28, 2002.

50.    Upon information and belief, the actions taken by AEA Bank in procuring the AEA USDA Loan were contrary, in whole or in part, to the requirements of the Directive.

51.    The restrictions upon AEA Bank imposed by the Directive were material to the Application of AlaskaCatch for the USDA Loan, and AEA Bank did not disclose the Directive to AlaskaCatch at any time material to the transaction.

52.    The Directive was modified February 26, 2003.

53.    The continued failure of AEA Bank to comply with the Directive and applicable banking laws and regulations resulted in an additional audit of AEA Bank in December 2003 and, ultimately, in a Cease and Desist Order of May 17, 2004, a copy of which is attached hereto as Exhibit 1.

54.    Based on the information contained in the Cease and Desist Order, Claimants state that AEA Bank had for many years been operating in an unsafe and unsound manner, and that the AEA USDA Loan was issued because of such unsafe and unsound practices.

55.    Contrary to USDA regulations, contrary to the Directive, and contrary to required operating policies, the issuance of the AEA USDA Loan caused AlaskaCatch, the *Wild Salmon*, and Claimants substantial damages in an amount to be proven at trial.

**Frontier Law Group, LLC**
800 E. Dimond Blvd., Suite 3-400
Anchorage, AK 99503
Telephone 907-561-3400; Facsimile 907-561-3401

## FOURTH CLAIM – FAILURE TO ACT IN GOOD FAITH

56.     Claimants reallege the material set forth above in these Counterclaims.

57.     Plaintiff/Counterclaim Defendant was at all times required to observe reasonable commercial standards of fair dealing in connection with the negotiation, performance and enforcement of obligations it claims to be due.  It failed to do so by:

a.   willfully failing to acknowledge personal property on the *Wild Salmon* at the time of its arrest belonged to third parties thereby willfully and wrongfully distraining such personal property;

b.   failing to disclose the Directive and the Cease and Desist Order and the accompanying restrictions on AEA Bank's ability to act in accord with reasonable commercial standards of fair dealing;

c.   obstructing and interfering with the charter, or charter with option, of the *Wild Salmon* for the 2005 season, causing substantial damage and the basis for set-off against AEA Bank's claimed debt;

d.   failing to pursue the co-obligor on the alleged debt that purportedly encumbers the *Wild Salmon*;

e.   making false and defamatory statements about persons and parties allegedly obligated to AEA Bank related to the Claims of its Complaint to third persons including, but not limited to, USDA personnel and potential Reorganization Plan Participants;

**Frontier Law Group, LLC**
800 E. Dimond Blvd., Suite 3-400
Anchorage, AK 99503
Telephone 907-561-3400; Facsimile 907-561-3401

Frontier Law Group, LLC
800 E. Dimond Blvd, Suite 3-400
Anchorage, AK 99503
Telephone 907-561-3400; Facsimile 907-561-3401

f.  failing to attempt to reasonably mitigate its alleged damages;

g.  the gross breach of AEA Bank's agreement with AlaskaCatch regarding working capital;

h.  intentionally seeking arrest of the *Wild Salmon* without notice to the known owner in derogation of due process of law; in this connection, AEA Bank extracted services upon false premises from Claimants by asking them to go to Alaska in connection with the *Wild Salmon* at their own expense after this case was filed but before it was disclosed; and

i.  using "Laser Pro" form documents to incorporate, in the aggregate, unconscionable terms and conditions and purported waivers of rights protected by law or regulation.

58.    The failure of AEA Bank to observe reasonable commercial standards of fair dealing has caused damage to the *Wild Salmon* and to Claimants in an amount to be proven at trial. Further, such conduct should cause the Court to refuse to enforce the Mortgage against the *Wild Salmon*, and should declare unenforceable all unconscionable terms of the loan documents under which Plaintiff/Counterclaim Defendant claims a debt secured by the *Wild Salmon*.

## FIFTH CLAIM – EXEMPLARY AND/OR PUNITIVE DAMAGES

59.    Claimants reallege the material set forth above in these Counterclaims.

60.    The failure of AEA Bank to observe reasonable commercial standards

of fair dealing constitutes an unfair and deceptive act and practice for which exemplary and/or punitive damages should be awarded according to the proof at trial.

### SIXTH CLAIM – STAY OF PROCEEDINGS

61.     The matters set forth in these Counterclaims above **and** those set forth in the Third Party Claim below are here reasserted.

62.     This action should be stayed pending the outcome of the arbitration and/or the claims against The 13th required by the Subscription Agreement, as that outcome may make moot the claims of Plaintiff against the *Wild Salmon*.

### SEVENTH CLAIM – ATTORNEYS FEES AND COSTS

63.     The *Wild Salmon* and Claimants are entitled under the documents sued upon by Plaintiff/Counterclaim Defendant, statute and/or recognized principle in equity to an award of their reasonable attorneys' fees and costs incurred in connection with this action.

### THIRD PARTY CLAIMS

### FIRST CLAIM -- COMPEL ARBITRATION

64.     The 13th Regional Corporation is an Alaska Corporation with its principal place of business in Seattle, Washington.

65.     The *Wild Salmon* is a Documented United States Vessel, O.N. 1077274, located in Alaska.

66.     On or about May 11, 2004, for good and valuable consideration, The

**Frontier Law Group, LLC**
800 E. Dimond Blvd., Suite 3-400
Anchorage, AK 99503
Telephone 907-561-3400; Facsimile 907-561-3401

13th agreed with AlaskaCatch in a document entitled Subscription Agreement, to become jointly and severally obligated upon the obligation of AlaskaCatch that Plaintiff asserts encumbers the *Wild Salmon*.

67.    The *Wild Salmon* and its owners, the Claimants, are third party beneficiaries of the Subscription Agreement.

68.    Despite demand upon The 13th to exonerate the claims that Plaintiff alleges encumber the *Wild Salmon*, The 13th has failed and refused to exonerate such claims.

69.    Under the Subscription Agreement, The 13th is obligated to arbitrate any claims against it arising out of or related to the Subscription Agreement after satisfying a fast track negotiation process.

70.    The 13th has failed and refused to honor the dispute resolution provisions of the Subscription Agreement regarding claims against it by AlaskaCatch.

71.    Through its counsel, The 13th has repudiated any obligation to arbitrate under the Subscription Agreement with any person or entity not a specific signatory to the Subscription Agreement.

72.    The *Wild Salmon* and Claimants are willing and able to abide by all provisions of resolution provided in the Subscription Agreement.

73.    It would be a useless act to require the *Wild Salmon* to make an additional demand for negotiation or arbitration upon The 13th as a prerequisite to

Answer, Defenses, Counterclaims and Third Party Claims
*Bay Bank v. Wild Salmon, Official No. 1077274, Case No. A05-265 CV*
Page 15of 19

Frontier Law Group, LLC
800 E. Dimond Blvd., Suite 3-400
Anchorage, AK 99503
Telephone 907-561-3400; Facsimile 907-561-3401

requesting this Court to order arbitration in accordance with the Federal Arbitration Act.

74.    The 13th should be immediately ordered to arbitrate its liability to Plaintiff under the Subscription Agreement and in accordance therewith.

### SECOND CLAIM – STAY OF ACTION

75.    Claimants reallege the material set forth above in these Counterclaims.

76.    This action should be stayed pending the outcome of such fast track arbitration.

### THIRD CLAIM -- EXONERATION

77.    Claimants reallege the material set forth above in these Counterclaims.

78.    In the event arbitration is not ordered, for any reason, The 13th is obligated under the Subscription Agreement to pay or otherwise exonerate the entire debt alleged by Plaintiff.

79.    As a matter of law, the *Wild Salmon* and Claimants are entitled to force The 13th to exonerate the debt claimed by Plaintiff herein by judgment.

80.    Upon payment of the debt alleged by Plaintiff, The 13th is not entitled to subrogation of any rights of Plaintiff to encumber the *Wild Salmon* as a result of the gross breaches of the Subscription Agreement by The 13th that resulted in the destruction of the business of AlaskaCatch, caused its bankruptcy and the liquidation of its business.

### FOURTH CLAIM – HOLD HARMLESS

81.    Claimants reallege the material set forth above in these Counterclaims.

**Frontier Law Group, LLC**
800 E. Dimond Blvd., Suite 3-400
Anchorage, AK 99503
Telephone 907-561-3400; Facsimile 907-561-3401

82.    In the event arbitration of the claims of the *Wild Salmon* and Claimants against The 13th is not ordered, The 13th is obligated under the Subscription Agreement to defend and hold harmless the Claimants from any claim or loss resulting from a claim by Plaintiff upon the assets of Claimants.

83.    Despite demand upon The 13th to hold Claimants harmless from the claims of Plaintiff encumbering the *Wild Salmon*, The 13th has refused to do so.

84.    The 13th should be ordered to defend and hold Claimants and the *Wild Salmon* harmless from the claims of Plaintiff.

## FIFTH CLAIM – ATTORNEY'S FEES AND COSTS

85.    Under the Subscription Agreement, statute and/or recognized principal in equity, the *Wild Salmon* and Claimants are entitled to an award of their reasonable attorney's fees and costs incurred in connection with this action.

**WHEREFORE**, having set forth their Answer, Defenses, Counterclaims and Third Party Claims, the *Wild Salmon* and Claimants pray for judgment as follows:

1.    quashing the arrest of the *Wild Salmon* and awarding costs, fees and damages for wrongful arrest;

2.    dismissing Plaintiff's Complaint and every part thereof with prejudice;

3.    awarding the *Wild Salmon* and Claimants their reasonable attorneys' fees and costs incurred in connection with this action against Plaintiff;

4.    awarding damages upon their Counterclaims in the amounts proven at

**Frontier Law Group, LLC**
800 E. Dimond Blvd., Suite 3-400
Anchorage, AK 99503
Telephone 907-561-3400; Facsimile 907-561-3401

trial;

5.   declaring that the Mortgage sued upon by Plaintiff is null and void;

6.   declaring that any suretyship obligation of the *Wild Salmon* or

Claimants has been released or is otherwise not enforceable by

Plaintiff;

7.   ordering a stay in these proceedings pending the outcome of arbitration

between the *Wild Salmon* and Claimants on the one hand and The 13th

on the other;

8.   ordering that the third party claims made herein are subject to

mandatory arbitration and ordering the same to immediate arbitration;

9.   alternatively, if arbitration is for any reason not ordered, then for

Judgment against The 13th directing (a) that it exonerate the claims of

the Plaintiff in such a manner as to render the *Wild Salmon* free of any

claim of the Plaintiff, and/or (b) that it hold Claimants and the *Wild*

*Salmon* harmless from any and all claims of Plaintiff; and

10.  awarding the *Wild Salmon* and Claimants their reasonable attorneys'

fees and costs incurred in connection with this action against The 13th.

//

//

**Frontier Law Group, LLC**
800 E. Dimond Blvd., Suite 3-400
Anchorage, AK 99515-2043
Telephone 907-561-3400; Facsimile 907-561-3401

DATED this _3ʳᵈ_ day of January, 2006.

FRONTIER LAW GROUP, LLC

By: _____

~~Christopher~~ D. Cyphers, AK Bar 9812085
Attorneys for Wild Alaskan Seafood House,
LLC, and R. Bruce Johnston and Ray
Wadsworth

**CERTIFICATE OF SERVICE**

I certify that on January _4ᵗʰ_, 2006,
I served a true and correct copy of the
foregoing on:

John E. Casperson
Holmes Weddell & Barcott, PC
701 West 8ᵗʰ Avenue, Suite 800
Anchorage, AK 99501

by   ☐ hand   ☒ mail   ☐ fax

_Jeannette Gibbons_
Jeannette Gibbons

**Frontier Law Group, LLC**
800 E. Dimond Blvd., Suite 3-400
Anchorage, AK 99515-2043
Telephone 907-561-3400; Facsimile 907-561-3401

Answer, Defenses, Counterclaims and Third Party Claims
*Bay Bank v. Wild Salmon, Official No. 1077274, Case No. A05-265 CV*
Page 19 of 19

**FDIC** FEDERAL DEPOSIT
INSURANCE CORPORATION
**INSURING AMERICA'S FUTURE**

Home > Regulation & Examinations > Bank Examinations > FDIC Enforcement Decisions and Orders

# FDIC Enforcement Decisions and Orders

ED&O Home | Indices | Search Form | Previous Paragraph | Next Paragraph | Text Search | ED&O Help

{{7-31-04 p.C-6085}}

[¶12,208] **In the Matter of Asia-Europe-Americas Bank, Seattle, Washington**, Docket No. 04-109B (5-17-04).

A cease and desist order was issued, based on findings by the FDIC that it had reason to believe that Respondent was engaged in unsafe and unsound practices.

[.1] **Management—Qualifications Specified**

[.2] **Management—Comprehensive Review Required**

[.3] **Compensation—Employee Compensation Report Required**

[.4] **Bank Operations—Expense Reimbursement, Policy Required**

[.5] **Board of Directors—Increased Participation in Bank Affairs Required**

[.6] **Capital—Tier 1 Capital Increase/Maintain**

[.7] **Loan Loss Reserve—Establishment of or Increase in Required**

[.8] **Assets—Charge-off or Collection**

[.9] **Loans—Extensions of Credit—To Borrowers with Existing Adversely Classified Credits**

[.10] **Loan Policy—Preparation or Revision of Policy Required**

[.11] **Loans—Special Mention**

[.12] **Strategic Plan—Preparation of Required**

[.13] **Profit Plan—Preparation of Plan Required**

[.14] **Violations of Law—Corrections of Violations Required**

[.15] **Funds Management and Liquidity—Preparation or Revision of Funds Management Policy Required**
{{7-31-04 p.C-6086}}

[.16] **Bank Secrecy Act— Compliance**

Exhibit 1
Page 1 of 11

[.17] **Holding Company—Written Policy Required**

[.18] **Dividends—Dividends Restricted**

[.19] **Shareholders—Disclosure of Cease and Desist Order Required**

[.20] **Progress Report—Written Report Required**

**In the Matter of**
**ASIA-EUROPE-AMERICAS BANK**
**SEATTLE, WASHINGTON**
**(Insured State Nonmember Bank)**
**ORDER TO CEASE AND DESIST**

FDIC-04-109B
DFI-04-1

Asia-Europe-Americas Bank, Seattle, Washington ("Bank"), having been advised of its right to a Notice of Charges and of Hearing detailing the unsafe or unsound banking practices and violations of law and/or regulations alleged to have been committed by the Bank and of its right to a hearing on the alleged charges under section 8(b)(1) of the Federal Deposit Insurance Act ("Act"), 12 U.S.C. §1818(b)(1), and having waived those rights, entered into a STIPULATION AND CONSENT TO THE ISSUANCE OF A CONSENT ORDER ("CONSENT AGREEMENT") with counsel for the Federal Deposit Insurance Corporation ("FDIC") and the Director of Banks, Department of Financial Institutions for the State of Washington ("Washington DFI"), dated May 3, 2004, whereby solely for the purpose of this proceeding and without admitting or denying the alleged charges of unsafe or unsound banking practices and violations of law and/or regulations, the Bank consented to the issuance of a CONSENT ORDER ("ORDER") by the FDIC and Washington DFI.

The FDIC and Washington DFI considered the matter and determined that they had reason to believe that the Bank had engaged in unsafe or unsound banking practices and had committed violations of law and/or regulations. The FDIC and Washington DFI, therefore, accepted the CONSENT AGREEMENT and issued the following:

*ORDER*

IT IS HEREBY ORDERED, that the Bank, its institution-affiliated parties, as that term is defined in section 3(u) of the Act, 12 U.S.C. §1813(u), and its successors and assigns cease and desist from the following unsafe and unsound banking practices and violations of law and/or regulations:

(a) operating with management whose policies and practices are detrimental to the Bank and jeopardize the safety of its deposits;

(b) operating with a board of directors which has failed to provide adequate supervision over and direction to the active management of the Bank;

(c) operating with an inadequate loan valuation reserve;

(d) operating with a large volume of poor quality loans;

(e) engaging in unsatisfactory lending practices;

(f) operating in such a manner as to produce low earnings;

(g) operating in violation of the following laws and/or regulations:

Exhibit 1
Page 2 of 11

(i) section 23B of the Federal Reserve Act, 12 U.S.C. §371c-1, made applicable to state nonmember insured institutions by section 18(j)(1) of the Act, 12 U.S.C. §1828(j)(1), as more fully described on page 18 of the Joint FDIC/State Report of Examination dated December 1, 2003 ("Report of Examination");

(ii) section 32 of the Federal Deposit Insurance Act, as more fully described on page 17 of the Report of Examination;

(iii) sections 215.4(a), 215.4(e) of Regulation O of the Board of Governors of the Federal Reserve System, 12 C.F.R. §§ 215.4(e), made applicable to state nonmember institutions by section 18(j)(2) of the Act, 12 U.S.C. §1828(j)(2), as more fully described on page 18 of the Report of Examination; and

(iv) Part 323 of the FDIC's Rules and Regulations, 12 C.F.R. Part 323, as more fully described on page 17 of the Report of Examination;

(h) operating in contravention of the following:

(i) FDIC's Guidelines for an Environment Risk Program, as more fully described on page 18 of the Report of Examination;

{{7-31-04 p.C-6087}

(ii) Appendix A to Part 365 of the FDIC's Rules and Regulations, 12 C.F.R. Part 365, Appendix A, as more fully described on pages 18 and 19 of the Report of Examination;

(iii) the Interagency Policy Statement on the Allowance for Loan and Lease Losses, as more fully described on pages 19 and 20 of the Report of Examination; and

(iv) Appendix A to Part 364 of the FDIC's Rules and Regulations, as more fully described on page 20 of the Report of Examination.

(i) operating with inadequate provisions for liquidity;

(j) paying excessive compensation to the Bank's chief executive officer; and

(k) operating with inadequate policies governing reimbursement of the chief executive officer's expenses.

IT IS FURTHER ORDERED, that the Bank, its institution-affiliated parties, and its successors and assigns, take affirmative action as follows:

[.1]1. The Bank shall have and retain qualified management.

(a) Each member of management shall have qualifications and experience commensurate with his or her duties and responsibilities at the Bank. Management shall include a chief executive officer with proven ability in managing a bank of comparable size, and experience in upgrading a low quality loan portfolio, improving earnings, and other matters needing particular attention. Management shall also include a senior lending officer with significant appropriate lending, collection, and loan supervision experience and experience in upgrading a low quality loan portfolio. Each member of management shall be provided appropriate written authority from the Bank's board of directors to implement the provisions of this ORDER.

(b) The qualifications of management shall be assessed on its ability to:

Exhibit 1
Page 3 of 11

(i) comply with the requirements of this ORDER;

(ii) operate the Bank in a safe and sound manner;

(iii) comply with applicable laws and regulations; and

(iv) restore all aspects of the Bank to a safe and sound condition, including asset quality, capital adequacy, earnings, management effectiveness, liquidity, and sensitivity to market risk.

(c) During the life of this ORDER, the Bank shall notify the Regional Director of the FDIC's San Francisco Regional Office ("Regional Director") and the Director of Banks, Department of Financial Institutions for the State of Washington ("Director of Banks") in writing when it proposes to add any individual to the Bank's board of directors or employ any individual as a senior executive officer. The notification must be received at least 30 days before such addition or employment is intended to become effective and should include a description of the background and experience of the individual or individuals to be added or employed.

[.2] 2. Within 60 days from the effective date of this ORDER, the Bank's board of directors shall retain a qualified independent outside party that is acceptable to the Regional Director and Director of Banks to conduct a study of the management and personnel structure of the Bank to determine whether additional personnel are needed for the safe and profitable operation of the Bank. Such a study shall include, at a minimum, a review of the duties, responsibilities, qualifications, and remuneration of the Bank officers. The Bank shall formulate a plan to implement the recommendations of the study. The plan shall be acceptable to the Regional Director and Director of Banks as determined at subsequent examinations.

[.3] 3. (a) Within 120 days from the effective date of this ORDER, the Bank shall adopt an employee compensation report after undertaking a review of compensation paid to any of the Bank's executive officers. At a minimum, the review shall include the following:

(i) A critical analysis of each individual's background, experience, duties and responsibilities, and an appraisal of each individual's performance compared to the present level of compensation;

(ii) a comparison of each officer's total compensation with compensation received by officers with similar responsibilities in similar institutions;

(iii) a determination of whether present executive officers are capable of implementing

{{7-31-04 p.C-6088}

board directives and policies, operating within the constraints of laws and regulations, and operating the Bank in a prudent manner; and

(iv) an analysis of compliance with the Interagency Guidelines under Appendix A to Part 364 of the FDIC Rules and Regulations regarding excessive compensation.

(b) The Bank's board must ensure executive compensation thereafter is reasonable and proportionate to the services performed, and conforms to regulatory guidance.

(c) For the purposes of this paragraph, "compensation" refers to any and all salaries, bonuses, and other benefits of every kind and nature whatsoever, whether paid directly or indirectly. The compensation plan and its implementation shall be in a form and manner acceptable to the Regional Director and Director of Banks as determined at subsequent examinations and/or visitations.

Exhibit 1
Page 4 of 11

[.4] 4. (a) Within 60 days from the effective date of this ORDER, the Bank shall formulate and submit to the Regional Director and the Director of Banks for review and comment a written policy covering expense reimbursements to its directors, officers, and employees. At a minimum, the policy shall include:

(i) Provisions which specify reasonable limitations for all categories of expenses related to customer entertainment and business development;

(ii) Provisions which require complete documentation of all expenses related to customer entertainment and business development prior to Bank reimbursement. At a minimum, the Bank shall require the submission of original receipt(s), identification of the person(s) entertained, and the business purpose of the expense;

(iii) Provisions which prohibit the reimbursement of personal expenses of the Bank's directors, officers, and employees; and

(iv) Provisions which incorporate those recommendations indicated on Question 6 of the Risk Management Assessment pages, as more fully described on page 16 of the Report of Examination.

(b) While this ORDER is in effect, the Bank's board of directors shall conduct monthly reviews of all expenses for customer entertainment, business development, and/or any other expense submitted by the Bank's officers and directors, with the results of the reviews stated in the minutes of the meetings of the board of directors at which such reviews are performed. On a monthly basis, the Bank shall seek reimbursement for any expenses paid which are not in conformance with the policy established pursuant to this paragraph.

(c) Within 30 days from the receipt of any recommended changes to the written policy from the Regional Director and the Director of Banks, and after adopting those changes, the Bank shall adopt the written policy, which approval shall be recorded in the minutes of a board of directors' meeting. Thereafter, the Bank shall implement and follow the written policy.

[.5] 5. (a) As of the effective date of this ORDER, the board of directors shall increase its participation in the affairs of the Bank, assuming full responsibility for the approval of sound policies and objectives and for the supervision of all of the Bank's activities, consistent with the role and expertise commonly expected for directors of banks of comparable size. This participation shall include meetings to be held no less frequently than monthly at which, at a minimum, the following areas shall be reviewed and approved: reports of income and expenses; new, overdue, renewal, insider, charged-off, and recovered loans; investment activity; operating policies; and individual committee actions. Board minutes shall document these reviews and approvals, including the names of any dissenting directors.

(b) Within 180 days from the effective date of this Order, the Bank shall increase its board of directors by the addition of at least one independent director who shall have substantial banking background and experience.

(c) During the life of this ORDER, in the event that a member of the Bank's board of directors resigns or otherwise leaves the board of directors, within 180 days from the date of such departure, the Bank shall replace such director with an independent director.

[.6] 6. (a) During the life of this ORDER, the Bank shall maintain Tier 1 capital in such an amount as to equal or exceed eight and one-half (8.5) percent of the Bank's total assets.

(b) The level of Tier 1 capital to be maintained during the life of this ORDER pursuant
{{7-31-04 p.C-6089}

to Subparagraph 6(a) shall be in addition to a fully funded allowance for loan and lease losses, the

Exhibit 1
Page 5 of 11

adequacy of which shall be satisfactory to the Regional Director and the Director of Banks as determined at subsequent examinations and/or visitations.

(c) Any increase in Tier 1 capital necessary to meet the requirements of Paragraph 6 of this ORDER may be accomplished by the following:

    (i) the sale of common stock; or

    (ii) the sale of noncumulative perpetual preferred stock; or

    (iii) the direct contribution of cash by the board of directors, shareholders, and/or parent holding company; or

    (iv) any other means acceptable to the Regional Director and the Director of Banks; or

    (v) any combination of the above means. Any increase in Tier 1 capital necessary to meet the requirements of Paragraph 6 of this ORDER may not be accomplished through a deduction from the Bank's allowance for loan and lease losses.

(d) If all or part of the increase in Tier 1 capital required by Paragraph 6 of this ORDER is accomplished by the sale of new securities by the Bank, the board of directors shall forthwith take all necessary steps to adopt and implement a plan for the sale of such additional securities, including the voting of any shares owned or proxies held or controlled by them in favor of the plan. Should the implementation of the plan involve a public distribution of the Bank's securities (including a distribution limited only to the Bank's existing shareholders), the Bank shall prepare offering materials fully describing the securities being offered, including an accurate description of the financial condition of the Bank and the circumstances giving rise to the offering, and any other material disclosures necessary to comply with the Federal securities laws. Prior to the implementation of the plan and, in any event, not less than fifteen (15) days prior to the dissemination of such materials, the plan and any materials used in the sale of the securities shall be submitted to the FDIC, Registration and Disclosure Unit, Washington, D.C. 20429, for review. Any changes requested to be made in the plan or materials by the FDIC shall be made prior to their dissemination. If the increase in Tier 1 capital is provided by the sale of noncumulative perpetual preferred stock by the Bank, then all terms and conditions of the issue, including but not limited to those terms and conditions relative to interest rate and convertibility factor, shall be presented to the Regional Director and the Director of Banks for prior approval.

(e) In complying with the provisions of Paragraph 6 of this ORDER, the Bank shall provide to any subscriber and/or purchaser of the Bank's securities, a written notice of any planned or existing development or other changes which are materially different from the information reflected in any offering materials used in connection with the sale of Bank securities. The written notice required by this paragraph shall be furnished within ten (10) days from the date such material development or change was planned or occurred, whichever is earlier, and shall be furnished to every subscriber and/or purchaser of the Bank's securities who received or was tendered the information contained in the Bank's original offering materials.

(f) For the purposes of this ORDER, the terms "Tier 1 capital" and "total assets" shall have, the meanings ascribed to them in Part 325 of the FDIC Rules and Regulations, 12 C.F.R. §§ 325.2(v) and 325.2(x).

[.7] 7. (a) As of the effective date of this ORDER, the Bank shall replenish the allowance for loan and lease losses ("ALLL") as directed on page 3 of the Report of Examination and thereafter maintain the ALLL at an adequate level.

(b) Within 30 days of the effective date of this ORDER, the Bank shall improve its ALLL methodology, correct all deficiencies relating to the ALLL methodology detailed in the Report of Examination, and ensure future compliance with outstanding regulatory statements of policy regarding ALLL.

Exhibit 1
Page 6 of 11

(c) Within 30 days from the effective date of this ORDER, the board of directors shall also develop or revise, adopt and implement a comprehensive policy for determining the adequacy of the ALLL. For the purpose of this determination, the adequacy of the ALLL shall be determined after the charge-off of all loans or other items classified "Loss." The policy shall provide for a review of the ALLL at least once each calendar quarter. Said review should be completed prior to the end of each quarter, in order that the findings of the board of directors with respect
{{7-31-04 p.C-6090}

to the ALLL may be properly reported in the quarterly Reports of Condition and Income. The review shall, at a minimum, focus on the results of the Bank's internal loan review, loan loss experience, trends of delinquent and non-accrual loans, an estimate of potential loss exposure of significant credits, concentrations of credit, and present and prospective economic conditions. A deficiency in the ALLL shall be remedied in the calendar quarter it is discovered, prior to submitting the Report of Condition, by a charge to current operating earnings. The minutes of the board of directors meeting at which such review is undertaken shall indicate the results of the review. Upon completion of the review, the Bank shall increase and maintain its ALLL consistent with the ALLL policy established. Such policy and its implementation shall be satisfactory to the Regional Director and the Director of Banks as determined at subsequent examinations and/or visitations.

[.8] 8. (a) Within five days from the effective date of this ORDER, the Bank shall eliminate from its books, by charge-off or collection, all assets classified "Loss" and one-half of the assets classified "Doubtful" in the Report of Examination that have not been previously collected or charged off. Elimination of these assets through proceeds of other loans made by the Bank is not considered collection for the purpose of this paragraph.

(b) Within 90 days from the effective date of this ORDER, the Bank shall have reduced the assets classified "Substandard" and "Doubtful" in the Report of Examination that have not previously been charged off to not more than $14,000,000.

(c) Within 180 days from the effective date of this ORDER, the Bank shall have reduced the assets classified "Substandard" and "Doubtful" in the Report of Examination that have not previously been charged off to not more than $12,000,000.

(d) Within 270 days from the effective date of this ORDER, the Bank shall have reduced the assets classified "Substandard" and "Doubtful" in the Report of Examination that have not previously been charged off to not more than $9,500,000.

(e) Within 365 days from the effective date of this ORDER, the Bank shall have reduced the assets classified "Substandard" and "Doubtful" in the Report of Examination that have not previously been charged off to not more than $7,500,000.

(f) The requirements of subparagraphs 8(a), 8(b), 8(c), 8(d), and 8(e) of this ORDER are not to be construed as standards for future operations and, in addition to the foregoing, the Bank shall eventually reduce the total of all adversely classified assets. Reduction of these assets through proceeds of other loans made by the Bank is not considered collection for the purpose of this paragraph. As used in subparagraphs 8(b), 8(c), 8(d), 8(e) and 8(f) the word "reduce" means:

(i) to collect;

(ii) to charge-off; or

(iii) to sufficiently improve the quality of assets adversely classified to warrant removing any adverse classification, as determined by the Regional Director and the Director of Banks.

[.9] 9. (a) Beginning with the effective date of this ORDER, the Bank shall not extend, directly or indirectly, any additional credit to, or for the benefit of, any borrower who has a loan or other extension of credit from the Bank that has been charged off or classified, in whole or in part, "Loss" and is

Exhibit 1
Page 7 of 11

uncollected. Subparagraph 9(a) of this ORDER shall not prohibit the Bank from renewing or extending the maturity of any credit in accordance with the Financial Accounting Standards Board Statement Number 15 ("FASB 15").

(b) Beginning with the effective date of this ORDER, the Bank shall not extend, directly or indirectly, any additional credit to, or for the benefit of, any borrower who has a loan or other extension of credit from the Bank that has been classified, in whole or part, "Doubtful" without the prior approval of a majority of the board of directors or the loan committee of the Bank.

(c) Beginning with the effective date of this ORDER, the Bank shall not extend, directly or indirectly, any additional credit to, or for the benefit of, any borrower who has a loan or other extension of credit from the Bank that has been classified, in whole or part, "Substandard" without the prior approval of a majority of the board of directors or the loan committee of the Bank.

(d) The loan committee or Board shall not approve any extension of credit, or additional credit to a borrower in paragraphs (b) and (c) above without first collecting in cash all past due interest. {{7-31-04 p.C-6091}

[.10] 10. (a) Within 120 days from the effective date of this ORDER, the Bank shall revise, adopt, and implement written lending and collection policies to provide effective guidance and control over the Bank's lending function, which policies shall include specific guidelines for placing loans on a non-accrual basis. In addition, the Bank shall obtain adequate and current documentation for all loans in the Bank's loan portfolio. Such policies and their implementation shall be in a form and manner acceptable to the Regional Director and the Director of Banks as determined at subsequent examinations and/or visitations.

(b) The initial revisions to the Bank's loan policy and practices, required by this paragraph, at a minimum, shall include the following:

(i) provisions, consistent with FDIC instructions for the preparation of Reports of Condition and Income, under which the accrual of interest income is discontinued and previously accrued interest is reversed on nonaccrual loans;

(ii) provisions which prohibit the capitalization of interest or loans related expense unless the board of directors supports in writing and records in the minutes of the corresponding board of directors meeting why an exception thereto is in the best interests of the Bank;

(iii) provisions which require complete loans documentation, realistic repayment terms and current credit information adequate to support the outstanding indebtedness of the borrower. Such documentation shall include current financial information, profit and loss statements or copies of tax returns and cash flow projections;

(iv) provisions which incorporate limitations on the amount that can be loaned in relation to established collateral values;

(v) provisions which specify the circumstances and conditions under which real estate appraisals must be conducted by an independent third party;

(vi) provisions which establish standards for unsecured credit;

(vii) provisions which establish officer lending limits;

(viii) provisions that require extensions of credit to any of the Bank's executive officers, directors, or principal shareholders, or to any related interest of such persons, to be approved in advance by a majority of the entire board of directors in accordance with section 215.4(b) of Regulation O of the Board of Governors of the Federal Reserve System, 12 C.F.R. §215.4(b);

Exhibit 1
Page 8 of 11



(ix) provisions which prohibit the issuance of standby letters of credit unless the letters of credit are fully secured by readily marketable collateral and/or are supported by current and complete financial information;

(x) provisions that directors first determine that the lending staff has the expertise necessary to properly supervise construction loans and that adequate procedures are in place to monitor any construction involved before funds are disbursed;

(xi) provisions which prohibit concentrations of credit in excess of 25 percent of the Bank's total equity capital and reserves to any borrower and that borrower's related interests;

(xii) provisions which require the preparation of a loan "watch list" which shall include relevant information on all loans which are classified "Substandard" and "Doubtful" in the Report of Examination or by the FDIC or Washington Department of Financial Institutions in subsequent Reports of Examination and all other loans which warrant individual review and consideration by the board of directors as determined by the loan committee or active management. The loan "watch list" shall be presented to the board of directors for review at least monthly with such review noted in the minutes;

(xiii) provisions which require verification, with proper documentation and the handling officer's signature, that all conditions attached to the loan approval have been satisfied by the borrower prior to the funding of the loan; and

(xiv) the board of directors shall adopt procedures whereby officer compliance with the revised loan policy is monitored and responsibility for exceptions thereto assigned. The procedures adopted shall be reflected in minutes of a board of directors meeting at which all members are present and the vote of each is noted.

[.11] 11. Within 90 days of the effective date of this ORDER, the Bank shall correct the following: {{7-31-04 p.C-6092}}

(a) all exceptions noted for those assets listed as "Special Mention" on pages 41 through 44 of the Report of Examination; and

(b) all technical exceptions found on pages 46 through 49 of the Report of Examination.

[.12] 12. Within 120 days of the effective date of this ORDER, the Bank shall develop and submit to the Regional Director and Director of Banks a written three-year strategic plan. Such plan shall include specific goals for the dollar volume of total loans, total investment securities, and total deposits as of January 1, 2004, and December 31, 2006. For each time frame, the plan will also specify the anticipated average maturity and average yield on loans and securities; the average maturity and average cost of deposits; the level of earning assets as a percentage of total assets; and the ratio of net interest income to average earning assets. The plan shall be in a form and manner acceptable to the Regional Director and the Director of Banks as determined at subsequent examinations and/or visitations.

[.13] 13. Within 120 days from the effective date of this ORDER, the Bank shall formulate and implement a written profit plan. This plan shall be forwarded to the Regional Director and the Director of Banks for review and comment and shall address, at a minimum, the following:

(a) goals and strategies for improving and sustaining the earnings of the Bank, including:

(i) an identification of the major areas in, and means by which, the board of directors will seek to improve the Bank's operating performance;

(ii) realistic and comprehensive budgets;

Exhibit 1
Page 9 of 11

(iii) a budget review process to monitor the income and expenses of the Bank to compare actual figures with budgetary projections; and

(iv) a description of the operating assumptions that form the basis for, and adequately support, major projected income and expense components; and

(b) coordination of the Bank's loan, investment, and operating policies, and budget and profit planning, with the funds management policy.

[.14] 14. (a) Except as provided in subparagraph (b) below, within 45 days from the effective date of this ORDER, the Bank shall eliminate and/or correct all violations of law and contraventions of statements of policy which are more fully set out on pages 17 through 20 in the Report of Examination.

(b) With respect to the second violation of Part 323 set forth on page 17 of the Report of Examination and contravention of the FDIC's Guidelines for an Environmental Risk Program set forth on page 18 of the Report of Examination:

(i) Within 45 days from the effective date of this ORDER, the Bank shall formulate and adopt a plan to address and correct said violation and contravention; and

(ii) Within 120 days from the effective date of this ORDER, the Bank shall eliminate and/or correct said violation and contravention.

(c) In addition, the Bank shall take all necessary steps to ensure future compliance with all applicable laws, regulations and policy statements.

[.15] 15. Within 90 days from the effective date of this ORDER, the Bank shall develop a plan to improve liquidity, which could include a combination of reduced dependency on non-core funding, increased balance sheet liquidity, and enhanced contingent borrowing capacity. Such plan and its implementation shall be in a form and manner acceptable to the Regional Director and the Director of Banks as determined at subsequent examinations and/or visitations.

[.16] 16. Within 60 days from the effective date of this ORDER, the Bank shall adopt and implement a policy for the operation of the Bank in such a manner as to ensure compliance with the provisions of the Bank Secrecy Act, USA Patriot Act and Part 353 of the FDIC's Rules and Regulations. The Bank shall address, at a minimum, enhanced controls on foreign deposit accounts, periodic Office of Foreign Assets Control checks on third party referral sources used to generate new foreign accounts, and additional training on the reporting and filing of suspicious activity reports. Such policy and its implementation shall be satisfactory to the Regional Director and the Director of Banks as determined at subsequent examinations and/or visitations.

[.17] 17. Within 60 days from the effective date of this ORDER, the Bank shall develop, adopt, and implement a written policy satisfactory to the Regional Director
{{7-31-04 p.C-6093}}

and the Director of Banks, which policy shall govern the relationship between the Bank and its holding company, and shall limit the payment of any management, consulting, or other fees or funds of any nature, directly or indirectly, to or for the benefit of the Bank's holding company to only those fees or funds paid in connection with services performed by the Bank's holding company on behalf of or for the benefit of the Bank.

[.18] 18. During the life of this ORDER, the Bank shall not pay cash dividends without the prior written consent of the Regional Director and the Director of Banks.

[.19] 19. Following the effective date of this ORDER, the Bank shall send to its shareholders or otherwise furnish a description of this ORDER in conjunction with the Bank's next shareholder communication and also in conjunction with its notice or proxy statement preceding the Bank's next

Exhibit 1
Page 10 of 11

shareholder meeting. The description shall fully describe the ORDER in all material respects. The description and any accompanying communication, statement, or notice shall be sent to the FDIC, Accounting and Securities Section, Washington, D.C. 20429, at least fifteen (15) days prior to dissemination to shareholders. Any changes requested to be made by the FDIC shall be made prior to dissemination of the description, communication, notice, or statement.

[.20] 20. Within 30 days of the end of the first quarter following the effective date of this ORDER, and within thirty (30) days of the end of each quarter thereafter, the Bank shall furnish written progress reports to the Regional Director and the Director of Banks detailing the form and manner of any actions taken to secure compliance with this ORDER and the results thereof. Such reports shall include a copy of the Bank's Report of Condition and the Bank's Report of Income. Such reports may be discontinued when the corrections required by this ORDER have been accomplished and the Regional Director and the Director of Banks have released the Bank in writing from making further reports.

This ORDER shall become effective ten (10) days from the date of its issuance.

The provisions of this ORDER shall remain effective and enforceable except to the extent that, and until such time as, any provisions of this ORDER shall have been modified, terminated, suspended, or set aside by the FDIC.

Pursuant to delegated authority.

Dated at San Francisco, California, this 17th day of May, 2004.

ED&O Home | Indices | Search Form | Previous Paragraph | Next Paragraph | Text Search | ED&O Help

Last Updated 8/29/2004                                                    legal@fdic.gov

**Home    Contact Us    Search    Help    SiteMap    Forms**
Freedom of Information Act    Website Policies    FirstGov.gov

Exhibit 1
Page 11 of 11